DAVID C. AND BETTY B. BURWELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JAMES L. HARROLD, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 22943-83, 9585-84.     Filed September 16, 1987.

sources and by aggregating its deductions allowed with respect to such gross income. [36 Fed. Reg. 8809 (May 13, 1971.]"

*Darrell V. Rippy* and *Leda G. Williams*, for the petitioners in docket No. 22943-83.

*Darrell V. Rippy*, *Leda G. Williams*, and *William L. Manuel*, for the petitioner in docket No. 9585-84.

*Elaine T. Fuller*, for the respondent.

## OPINION

FEATHERSTON, *Judge*: These consolidated cases were assigned to Special Trial Judge Helen A. Buckley pursuant to the provisions of section 7456(d) (redesignated sec. 7443A(b) by sec. 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rules 180 and 181.[1] The Court agrees with and adopts her opinion which is set forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

BUCKLEY, *Special Trial Judge*: Docket No. 22943-83, David C. and Betty B. Burwell, was tried first; subsequently, its record was incorporated by reference into the record in docket No. 9585-84, James L. Harrold. The two cases were consolidated for purposes of briefing and opinion.

Respondent determined deficiencies in Federal income taxes and additions to tax for 1980 and 1981 for the Burwells as follows:

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

| Year | Deficiency | Additions to tax | |
| --- | --- | --- | --- |
| | | Sec. 6653(a) | Sec. 6653(a)(1) |
| 1980 | $5,360 | $268.00 | - - - |
| 1981 | 9,904 | - - - | [2]$495.20 |

The Burwells were residents of West Covina, California, when their petition was timely filed.

Respondent determined a deficiency in petitioner Harrold's 1982 Federal income tax of $8,872, together with an addition to tax under section 6653(a)(1) in the amount of $444, under section 6653(a)(2) in the amount of 50 percent of the interest due on $8,872, and under section 6661(a) in the amount of $887. Harrold resided in Laguna Hills, California, when he timely filed his petition herein.[3]

Both cases involve a single main issue: whether petitioners made contributions deductible under section 170(c) to the Universal Life Church, Inc. Subsidiary issues are whether petitioners Burwell are liable for additions to tax under section 6653(a) and section 6653(a)(1); whether petitioner Harrold is liable for additions to tax under sections 6653(a)(1) and (2), and section 6661(a); and lastly, whether damages should be awarded to the United States under the provisions of section 6673.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and attached exhibits are incorporated herein by this reference.

Petitioners in both cases formed "congregations"[4] chartered by the Universal Life Church, Inc. (hereafter ULC Modesto). During the years 1980, 1981, and 1982, ULC Modesto was listed by the Internal Revenue Service in Publication 78, Cumulative List of Organizations Described in Section 170(c) of the Internal Revenue Code of 1954. Under date of August 28, 1984, the Internal Revenue Service announced by news release that ULC Modesto was

---

[2]Respondent did not determine an addition to tax under sec. 6653(a)(2).

[3]These cases are the test cases of a large group of cases. The great majority of the other pending cases have entered into stipulations agreeing to be bound by the final decisions herein. Petitioner Harrold also has pending docket No. 23705-83 in this Court involving the same contributions issue.

[4]We use terms such as "congregations," "church," "parsonage," "pastor," and "minister" for purposes of simplicity; the uses do not indicate findings on our part as to such status.

no longer so listed. Petitioners claimed deductible contributions to ULC Modesto as follows:

| Petitioner | Year | Amount |
|---|---|---|
| David C. and Betty B. Burwell | 1980 | $20,985 |
| | 1981 | 25,254 |
| James L. Harrold | 1982 | 24,835 |

On their returns, the Burwells reported total contributions of $23,771 and $22,468, for 1980 and 1981, respectively. The deduction for 1980 was subject to the 50-percent limitation of sec. 170, and the balance of the deduction was claimed as a carryover to their 1981 year. Respondent disallowed all of the above deductions.

### The Burwells, Docket No. 22943-83

David and Betty Burwell were both employed during 1980 and 1981. David was an engineer and Betty a teacher's aide. They received compensation for services as follows:

| | 1980 | 1981 |
|---|---|---|
| David | $32,000.00 | $48,739.36 |
| Betty | 6,108.75 | 7,014.69 |
| Total | 38,108.75 | 55,754.05 |

Petitioners' connections with ULC Modesto[5] began in June 1980. Some friends at work, who were ULC Modesto "ministers," told David about the organization. David and Betty applied for minister's credentials by mail and they were received at no cost for life from ULC Modesto. There were no educational or other standards required for the credentials.

David started his "congregation" in June 1980, meeting the ULC Modesto requirements that there be three persons over the age of 18 as members of each congregation, that those three persons fill the offices of pastor, secretary and treasurer, and that the pastor be a minister. David selected three persons as his founding members: himself as pastor, his wife, Betty, as secretary, and his eldest son as treasurer.

---

[5]For simplicity, references to congregations formed by application to ULC Modesto will be referred to as "congregations" or by their specific, assigned charter number or name.

The Burwells' congregation, Congregation No. 30470, was formed by the execution of a charter agreement by ULC Modesto. The charter agreement provided, inter alia:

Neither party to this agreement is the general agent of the other. The Universal Life Church, Inc., issues this charter in consideration of the signatories' promise that they will indemnify, save harmless, and defend the Universal Life Church, Inc., for all liability from damages to persons or property in any suit at law arising out of this agreement.

By this agreement, the Universal Life Church, Inc. hereby authorizes this chartered congregation to open a bank account in the name of the Universal Life Church, Inc.

The Burwells also entered into a congregational agreement with the Church of Universal Harmony, another organization chartered by ULC Modesto. This agreement also reiterated that neither of the groups was the agent of the other or of ULC Modesto. The record does not show the tax status of the Church of Universal Harmony. The Church of Universal Harmony had no authority over Charter No. 30470. However, the Church of Universal Harmony agreed "to defend it [Charter 30470] against all legal attacks upon its organizational status at no expense to the chartered congregation or its directors." The Burwells paid $23 per month to the Church of Universal Harmony.

The Burwells established a separate bank account for their Charter 30470 at Crocker Bank in the name of Universal Life Church, Inc. They alone and not ULC Modesto chose the bank and determined the account signators. The Burwells were the only persons with signatory power over this account. They also maintained a personal checking account. Expenses paid out of the congregation account consisted of payments inter alia on the Burwells' house, electricity and gas utilities, water, telephone, automobile expenses, checks to various other Universal Life Church congregations, repavement of the driveway, Roto-Rooter, new doors, pool chemicals and services, automobile insurance, flowers, food, books, life insurance, automobile club dues, automobile licenses, servicing, gas, plumbing, pest control, and the children's medical expenses.[6] In

---

[6]David testified that he paid monthly dues to ULC Modesto and only authorized expenses from the account, but the record does not show this to be true. In the absence of any corroborating evidence, we find this testimony incredible.

short, the expenses paid from the account were precisely of the same nature as would be paid by any couple, of equivalent financial status, with two children living at home, as had David and Betty, for their everyday living expenditures.

ULC Modesto did not authorize, review or consider the expenditures made from the Charter 30470 account in any way. Under the business practice of Crocker Bank the fact that the account was in the name of Universal Life Church, Inc., did not determine who had signatory authority over the account. That was determined by the signature cards.[7]

The congregation passed a resolution to help young people with problems. There is no indication in the record that either David or Betty had any special ministerial training and it is clear that ULC Modesto did not require any such training.[8] The Burwells spread the word of their availability by attending weekly meetings of the Palmer Drug Abuse Program with their children, meetings with other parents whose children had chemical dependency problems, and through notices posted in bus depots. The Burwells were participating in many of the same sorts of activities prior to their obtaining the ULC charter. No specific activities or educational background are required of ULC Modesto ministers. The ULC Modesto creed is "that we only believe in that which is right, and every person has the right to interpret what is right for themselves." Rev. Hensley, founder and chairman of the board of ULC Modesto, recommends that they teach what he teaches, and believe what he believes "because I believe I've got the truth."

ULC Modesto provides a variety of courses and information described by Rev. Hensley as follows:

It has [a] charter in it for the university—I mean, of California, but we do not use it. We have our own law school, which you know. We make our own lawyers, and we have several different kind of educational departments.

---

[7] Although David testified that he believed ULC Modesto was able to change the authorized signatures on the account, it is clear that he did not anticipate or believe that would happen and we did not find his testimony credible. Further, there is no credible evidence of record showing ULC Modesto could have changed the signatory authority without his consent.

[8] David testified he was a lifelong Episcopalian.

We have some that's religious that has Bible courses. We have others that's metaphysic. And then we have some that's just way out beyond Cloud 9.

ULC Modesto did not review operations of the Burwells' charter. ULC Modesto did not receive the use of, or have the ability to use, any of the funds deposited into the charter's checking account. ULC Modesto did not audit the receipts and expenditures from the checking account nor did it perform any accounting functions in regard thereto.[9]

### James L. Harrold, Docket No. 9585-84

Petitioner James L. Harrold (Harrold) was employed as a contract industrial manufacturing engineer with various aerospace companies, and also had his own consulting business. After reading a newspaper article about ULC Modesto, Harrold wrote to the headquarters in Modesto seeking additional information. In May, 1980, he was licensed as a minister and formed Congregation No. 38116.[10] Harrold executed a congregational agreement with the Church of Universal Harmony, but placed no evidence into the record relating to the Church of Universal Harmony or its tax status.

Harrold opened bank accounts for Charter 38116, checking and savings. Harrold alone chose the bank and determined the account signator. ULC Modesto played no role in these matters. The resolution to open the account was signed by the three directors of petitioner's charter: Harrold, his daughter, and a friend. Harrold was the sole signatory on these accounts.

During 1982, Harrold's wage income was $51,765. He deposited into the charter bank account the sum of $24,835 during 1982. Harrold wrote checks on the charter account to his daughter, Maureen, labeled as scholarship fund; to an animal hospital for care of his dog;[11] to the friend with

---

[9]Rev. Hensley testified that when a congregation has its charter revoked or if it discontinues operations, ULC Modesto attempts first to revive the congregation. If unsuccessful, the assets are taken over by ULC Modesto. He failed, however, to provide any evidence whatsoever, other than his testimony which we did not find credible, that this had ever occurred.

[10]The requisite three-person congregation consisted of Harrold, his daughter, Janelle, and a friend.

[11]"Parsonage security animal."

whom he lived for rent and utilities; for furniture, trash service, vehicle leasing, tuition fees, textbooks, ACLU dues, traffic fine, Blue Cross insurance, medical payments, gasoline, magazine subscriptions, his son, Brian, note payments, taxes on a Pennsylvania property (labeled church retreat), various grocery stores, many checks for cash and so forth. Harrold used this account for his personal, family and living expenses during the year at issue. It is clear, and we find, that he always intended to retain complete control of these accounts and that he always intended to, and did, use them for his own personal living expenses. ULC Modesto did not intend to exercise control over the accounts and it did not exercise such control.[12]

Prior to 1980, Harrold had taken psychology and human service courses. He continued his practice of counseling alcohol and drug addicted persons and working on a prisoner release program. He wanted to help others. After his ULC Modesto association, Harrold's volunteer work remained unchanged.[13]

Harrold performed a baptism, placed a newspaper ad offering counseling, sponsored a baseball team, counseled

---

[12]Harrold testified that the funds in the accounts belonged to ULC Modesto, that ULC Modesto could withdraw them at will and that ULC Modesto could remove him as an authorized signatory to the accounts. We did not find this testimony credible. In contrast to Harrold's testimony, we carefully reviewed the "ULC Book" which was introduced into evidence. This book sets forth the views of ULC Modesto and contains various forms and suggestions for organizing a congregation. In regard to setting up bank accounts, the book, which was copyrighted in 1980, suggests as follows:

"We suggest that all Universal Life Church Congregations open their bank accounts as unincorporated associations in the name Universal Life Church. We suggest this for two reasons: 1) By placing the official seal on the bank signature card the International Headquarters would be able to transact business with the account. We do not want to take this responsibility, and I'm sure that you would not want this either."

This statement of ULC Modesto firmly accords with Harrold's actual behavior in regard to the bank accounts.

[13]Queried about his ministerial activities, Harrold stated in part:

"I would normally every Friday night, almost every Friday, we would have a group session meeting with people that I considered to be in the congregation. They did not necessarily consider themselves to be in the congregation; I considered them to be in the congregation. They were young—as I say young people."

Later, Harrold described the Sunday "service:"

"Not—well, usually the Sundays were usually more of a social event and in fact it eventually evolved into a—well, a ball team developed; we developed a ball team, softball team, which they had been doing some pick up ball on their own and we formalized that. We—you know, some discussion got going and there was some indication that you know, gee, we should get in a league and I encouraged that very much and they eventually did and I supported that effort in a number of ways, such as providing uniforms and social outings, parties or gatherings, if you will, on a number of occasions mostly holiday occasions."

team members and others, and attempted to help them live in a socially acceptable manner.

OPINION

## 1. *Motion To Limit Exercise of Jurisdiction*

In docket No. 22943-83, the Burwells filed a motion to limit our jurisdiction. In it they contend—

the Court does not have the jurisdiction to determine, on the merits, the identity and extent of the donee organization or whether the donee organization is a qualified organization under section 170(c)(2), except to the extent the Court may take notice that ULC was listed during the taxable years in issue in the Cumulative List of Organizations described in Section 170(c), Publication 78, Treasury Department, Internal Revenue Service.

The gist of their argument is that because ULC Modesto is not a party to this proceeding, it is a violation of the due process of ULC Modesto to adjudicate petitioners' cases. The Burwells also filed an amendment to their petition, making essentially the same argument.

We agree that ULC Modesto is not a party to this litigation, but we are somewhat bemused by the Burwells' making this argument since their main argument in these cases has been that they are an integral part of ULC Modesto, that they are one and the same as ULC Modesto. Indeed, Rev. Hensley testified that he could call a meeting of any congregation in the country "because I am the Chairman of any Board of anywhere in the country." Despite the anomaly of their assertions, the exempt status of ULC Modesto is not at issue here. The issue to be decided is whether respondent's determination of the disputed deficiencies was erroneous and that turns on whether the Burwells made deductible contributions to an organization qualified under section 170(c). The Burwells' motion will be denied.

It is not necessary for this Court to make any determination in these cases in regard to the tax status of ULC Modesto, a matter we leave to the U.S. Claims Court where that issue is now pending.[14]

---

[14]ULC Modesto was found to be a qualified charitable organization in *Universal Life Church v. United States*, 372 F. Supp. 770 (E.D. Cal. 1974). During the taxable years involved here,

## 2. *Petitioners' "Contributions"*

Petitioners in both cases contend that the bank accounts into which they deposited the amounts for which they claimed contribution deductions in fact belonged to ULC Modesto, and from this they argue that they are entitled to the deductions claimed.

Petitioners' only possible statutory basis for a deduction turns upon the provisions of section 170(a) which allows a deduction for "any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year." Subsection (c) defines "charitable contribution" to mean "a contribution or gift to or for the use of" certain entities organized and operated exclusively for, inter alia, religious or charitable purposes, no part of the net earnings of which inures to the benefit of any individual.

Neither the statute nor the regulation defines what is meant by "contribution or gift." *Foster v. Commissioner*, 80 T.C. 34, 222 (1983), affd. on this issue 756 F.2d 1430 (9th Cir. 1985). The expression "charitable contribution" as used in section 170 is synonymous with the word "gift." Sec. 170(c); *DeJong v. Commissioner*, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). A gift is the by-product of "detached and disinterested generosity" given "out of affection, respect, admiration, charity or like impulses." *Commissioner v. Duberstein*, 363 U.S. 278, 285 (1960). A gift lacks legal or moral obligation and the inducement of anticipated benefit. *Commissioner v. Duberstein, supra* at 286.

We stated our own test in *DeJong v. Commissioner, supra* at 899:

---

ULC Modesto was listed as an organization exempt from tax under the provisions of sec. 501(c)(3). The Internal Revenue Service subsequently revoked its determination that ULC Modesto is a tax-exempt organization. Announcement 84-90, 1984-36 I.R.B. 32 (Sept. 4, 1984). On Nov. 8, 1984, ULC Modesto filed an action in the United States Claims Court (docket 583-84T) seeking declaratory relief under the provisions of sec. 7428. The Claims Court has not yet rendered its determination as to ULC Modesto's qualification as an organization described in sec. 501(c)(3).

Respondent's position is that his revocation of exempt status of ULC Modesto was retroactive in nature, and he therefore contends that ULC Modesto was not an organization defined in sec. 170(c)(2) during the years in question. This question, too, we leave to the Claims Court. Our holding is that these petitioners did not make contributions to ULC Modesto, so that the nature of that organization's tax exemption is irrelevant to our determinations herein.

A gift is generally defined as a voluntary transfer of property by the owner to another without consideration therefor. If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift. * * *

Whether a donation has been made is a question of fact. *Johnson v. Commissioner*, 48 T.C. 636, 639 (1967). We find that petitioners never intended to make, and in fact never did make, contributions to ULC Modesto.

Petitioners would have us believe that they gave substantial sums to ULC Modesto by depositing them in accounts bearing the name Universal Life Church, Inc. They have submitted numerous canceled checks in their futile attempt to prove this contention. In examining their intention in regard to these transfers, we find these transactions were not gifts. By those checks, petitioners transferred funds into bank accounts which were nominally in the name of Universal Life Church, Inc., but with respect to which they alone had signatory authority. Despite their testimony that they believed ULC Modesto could take over these accounts—testimony we find incredible—petitioners believed that they had full and complete control of the bank accounts. This is evidenced clearly by the checks which they wrote on the accounts. They used these accounts as any individual would use their personal checking accounts. They paid house mortgages, rent, utility costs, automobile costs, property tax bills, insurance bills, medical bills, school tuition, textbook costs, and so forth. None of the petitioners placed the bank deposits beyond their dominion and control.

Petitioners were not motivated by "detached and disinterested generosity" in their so-called gifts. They were instead motivated, at the expense of the fisc of the United States, by greed inspired by the ULC Modesto whose interest was to "flood the country with Churches, and we'll all become tax-exempt."[15] Petitioners made no contributions to ULC

---

[15]Rev. Hensley testified about his purpose in founding ULC Modesto:

"To bring freedom of religion, to give people an opportunity to express themselves and to be free, get out from under that yoke of bondage that the church has on people."

\*　　\*　　\*　　\*　　\*　　\*　　\*

"In 19- -- after I was religious well, I found out that you cannot separate the church from the state. So therefore, when I went to the IRS, told them to try to get them to tax the Church. See, I believe the Church should be taxed, and I preached it all the time, that the

Modesto. They simply transferred funds from their private accounts to accounts labeled Universal Life Church, Inc. They retained complete dominion and control over these funds and they utilized them for their own private purposes. The transfers were not, therefore, contributions within the meaning of sec. 170. *Wedvik v. Commissioner*, 87 T.C. 1458 (1986); *Svedahl v. Commissioner*, 89 T.C. 245 (1987).

Section 262 provides "Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses." Petitioners cannot, through their mail-order "churches," translate their personal expenses into deductible charitable contributions. We are reminded of the pithy language of Judge Kaufman of the Second Circuit in *Mone v. Commissioner*, 774 F.2d 570 (1985), affg. a Memorandum Opinion of this Court:

> Every year, with renewed vigor, many citizens seek sanctuary in the free exercise clause of the first amendment. They desire salvation not from sin or from temptation, however, but from the most earthly of mortal duties—income taxes. * * *

To the extent that petitioners made payments to the Church of Universal Harmony, the evidence reveals that such payments were for bookkeeping assistance and like matters. Apart from the fact that the record does not show that organization was a qualified one, such payments cannot constitute contributions, as petitioners expected a commensurate benefit in return. See, e.g., *Hernandez v. Commissioner*, 819 F.2d 1212 (1st Cir. 1987), affg. an unreported decision of this Court; *Murphy v. Commissioner*, 54 T.C. 249 (1970); *DeJong v. Commissioner, supra.*

### 3. *Private Inurement*

Section 170, in defining a charitable contribution or gift, limits deductibility to gifts made to those certain organizations "no part of the net earnings of which inures to the

---

Church should be taxed, should not be tax-free, and since they would not do it, I said, 'Well, we'll go out here and flood the country with Churches, and we'll all become tax-exempt. It's just as fair for one as it is for another.'

"So we started then, about '75 or sometime like that, we started congregations all over the country, and you see where it's at now."

Rev. Hensley further testified that, at the time of the trial, ULC Modesto had about 14 million ministers.

benefit of any * * * individual." Had we held that petitioners in fact had made gifts to ULC Modesto, we would nonetheless refuse to allow the deductions in question. The pervasive use of the so-called ULC Modesto accounts by all petitioners herein for purely personal and family expenses clearly results in self-inurement to them of a type which would result in *any* such organization falling outside the statutory guidelines for the allowance of the deduction. See, e.g., *Smith v. Commissioner*, 800 F.2d 930 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; *Davis v. Commissioner*, 81 T.C. 806 (1983), affd. by unpublished opinion, 767 F.2d 931 (9th Cir. 1985); *Miedaner v. Commissioner*, 81 T.C. 272 (1983).

### 4. *One Universal Life Church Organization*

Our holding above that none of these petitioners made contributions to a tax-exempt entity when they transferred funds into the bank accounts, as a practical matter, resolves the substantive issues in these cases. We nevertheless proceed to consider what was to be petitioners' main argument in these cases: that the various congregations affiliated with ULC Modesto are in fact one and the same as ULC Modesto and thus they fall within the tax-exempt status of ULC Modesto during the years in question. We have considered and rejected this argument in cases too numerous to mention. Thus, in *Davis v. Commissioner*, *supra* at 815, we held that "ULC Modesto's exemption is not a group exemption" citing numerous holdings to like effect in Memorandum Opinions. See also *Smith v. Commissioner*, *supra*; *Universal Life Church (Full Circle) v. Commissioner*, 83 T.C. 292 (1984).

The Ninth Circuit, in *Hall v. Commissioner*, 729 F.2d 632 (9th Cir. 1984), affg. a Memorandum Opinion of this Court, in considering another so-called contribution to ULC Modesto under circumstances almost identical to those at bar, stated (p. 634), "The courts have repeatedly held that exemptions for parent churches do not automatically carry over to local congregations." See also *Rager v. Commissioner*, 775 F.2d 1081 (9th Cir. 1985), affg. a Memorandum Opinion of this Court; *Kalgaard v. Commissioner*, 764 F.2d

1322 (9th Cir. 1985), affg. a Memorandum Opinion of this Court.

Nevertheless, we once again consider the question in light of the testimony of petitioners' expert witness on business organizations. Petitioners argue that as a matter of law, their congregations are a part of ULC Modesto, somewhat akin to that of a corporation with separate divisions or branch offices. Petitioners, in support of their thesis, offered the testimony of an expert in business organizations and associations. He concluded that, because the various congregations are formed under the authority of a ULC Modesto resolution, operate under the ULC Modesto name, and write checks on accounts labeled Universal Life Church, Inc., they are one and the same organization. He analogized each petitioner as a sole shareholder in a corporation, with the signatory power to disburse the corporate funds. He was also impressed by the fact that the ULC Modesto bylaws provided that any ordained ULC Modesto minister was an associate member of the "church" (ULC Modesto), and as such, that person had a duty to use church funds for the good and for purposes of the organization. The fact that the funds might not have been so used, he opined, merely served to indicate a breach of fiduciary responsibility, not a change in the perceived relationship between ULC Modesto and its congregations. Petitioners' expert arrived at his conclusions by reviewing the paper record between ULC Modesto and the congregations. We, however, take a different approach.

For purposes of Federal income tax law, the substance of a transaction rather than its form is controlling. *Kingsbury v. Commissioner*, 65 T.C. 1068, 1083, 1085 (1976); *Gregory v. Helvering*, 293 U.S. 465 (1935). The test is what the parties intended, their agreement, and their conduct in executing its provisions. *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949). Other than the self-serving testimony of petitioners, the record fails to reveal that they forwarded reports of their activities to ULC Modesto; it fails to reveal any review by ULC Modesto of any of the activities of petitioners; it fails to reveal any dominion or control by ULC Modesto over the person, assets, or activities of these petitioners, or any legal right to do so. What the record

does reveal is a pattern of petitioners continuing their various activities in life—personal, social, professional, and economic—in the same manner after adopting the charter of ULC Modesto as they had conducted themselves prior to their accession to ministerial credentials and charterhood.[16] We can only conclude that these petitioners were, through utilization of ULC Modesto and the mails, attempting to translate their everyday life expenses into deductible contributions. We will not, by closing our eyes to reality, allow a paper trail to transform illusion into a tax deduction. As we stated in *Miedaner v. Commissioner*, 81 T.C. at 281, "The church account was simply a magic wand whereby personal expenses were converted into tax deductions."

### 5. *Additions to Tax*

Petitioners did not address any of the additions to tax in their briefs but devoted their entire argument to their claim for the deductions. We are not sure whether their briefs were intended to concede the additions to tax or whether their failure to discuss them was an oversight. We shall, therefore, discuss each addition to tax briefly.

### (a) *Section 6653*

Respondent determined that petitioners are liable for the additions to tax under section 6653(a). The burden of proving these additions were improper rests on petitioners and they have failed to meet their burden. They have failed to show that the underpayments were not due to negligence or intentional disregard of rules and regulations. See *Hall v. Commissioner*, 729 F.2d at 635. Petitioners must have known that they could not convert their personal expenses into deductions by the simple expedient of setting up their bank account in the name of the Universal Life Church, Inc. We find that petitioners were negligent in claiming these deductions, and in the case of petitioner Harrold, that all of the underpayment of tax was due to negligence.

---

[16]David Burwell testified that he thought the ULC charter would provide a way to "have an active ministry dealing with young people, young people who were having problems with drugs and alcohol and suicide." But he had previously engaged in such activities. Moreover, the funds allegedly donated to ULC Modesto were not used in carrying on that work but were used in large part, if not entirely, to defray his family's personal expenses.

## (b) *Section 6661*

Respondent determined that petitioner Harrold was liable for the addition to tax under the provisions of section 6661(a).[17] That section as applicable to returns due to be filed after 1982 imposes an addition to tax in an amount equal to 10 percent of the amount of any underpayment attributable to a substantial understatement of income tax. "Understatement" is defined as the excess of the amount of tax required to be shown on a return over the amount of tax actually shown on a return. An understatement is "substantial" when it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return. Thus, there was a substantial understatement, within the meaning of section 6661, in Harrold's 1982 return.

The statute goes on, however, to provide that under certain circumstances, there may be a reduction in the amount of the understatement. Thus, section 6661(b)(2)(B) provides as follows:

(B) REDUCTION FOR UNDERSTATEMENT DUE TO POSITION OF TAXPAYER OR DISCLOSED ITEM.—The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to—

(i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or

(ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.

Harrold has made no attempt to show that there was substantial authority for his position and can take no comfort in that provision.[18] Indeed, all of the authority is

---

[17]Sec. 6661(a) was added by Pub. L. 97-248, sec. 323(a), 96 Stat. 613, applicable to returns the due date for filing of which is after Dec. 31, 1982. Thus, this issue concerns Harrold who has his 1982 tax year before the Court, but not the Burwells whose deficiencies were for earlier years.

[18]Conf. Rept. 97-760 (1982), 1982-2 C.B. 600, 650, accompanying the enactment of sec. 6661 as one of the provisions of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, explains that "substantial authority" means that "when the relevant facts and authorities are analyzed with respect to the taxpayer's case, the weight of the authorities that support the taxpayer's position should be substantial when compared with those supporting other positions." See sec. 1.6661-3, Income Tax Regs. Petitioners have cited no authority which, on analysis, supports their position. Even by the time Harrold's 1982 income tax return was filed, several court decisions had already rejected the contention that the ULC Modesto exemption ruling qualified congregations of ULC Modesto. See, e.g., *United States v. Toy National Bank* (N.D. Iowa 1979, 43 AFTR2d 79-954, 79-1 USTC par. 9344); *Brown v. Commissioner*, T.C. Memo. 1980-553; *Riemers v. Commissioner*, T.C. Memo.

*against* the position taken by Harrold. He therefore is not entitled to reduce the amount of his substantial understatement of income tax on this ground.

We therefore consider whether the amount of understatement of income tax may be reduced because of the statutory provision for reduction as to items with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return. Harrold's return shows a contribution to "Universal Life Church, Inc. Modesto, Ca." in the amount of $24,835. We hold that petitioner's so-called return disclosure was a false and misleading statement. In April of 1983, when the return was filed, ULC Modesto was listed by the Internal Revenue Service as an organization exempt from tax under the provisions of section 501(c)(3), contributions to which were deductible under section 170. Petitioner's objective evidently was to induce an examining revenue agent to accept the return as filed. Harrold knew as a fact that he had not sent any funds to ULC Modesto and that he alone had signatory power over the accounts. No one other than Harrold had control over these accounts. He used them for his personal living expenses. The representation on the return that he had made a contribution to ULC Modesto was thus not only potentially misleading to an examining revenue agent but was not true. Harrold not only failed adequately to disclose but misrepresented "the relevant facts affecting the item's tax treatment" within the meaning of section 6661(b)(2)(B)(ii).[19] Harrold's understatement of

---

1981-456; *Kellman v. Commissioner*, T.C. Memo. 1981-615. Numerous other later opinions, some of which are referred to in the text, reached the same conclusion.

[19]For the disclosure standards under sec. 6661, see sec. 1.6661-14, Income Tax Regs. Sec. 6661 was added to the Internal Revenue Code by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324. In *Schirmer v. Commissioner*, 89 T.C. 277, 286 n. 7 (1987), the Court pointed out that the general explanation of the act, prepared by the Staff of the Joint Committee on Taxation, states that the standard of disclosure under sec. 6661(a)(2)(B)(ii) requires "greater disclosure than is necessary to avoid the six-year statute of limitations provided for in section 6501(e)(1)(A)." Staff of Joint Comm. on Taxation, General Explanation of the Tax Equity and Fiscal Responsibility Act of 1982, at 218 (J. Comm. Print 1982). In determining whether there has been an omission of more than 25 percent of the gross income stated in a return for the purpose of triggering the sec. 6501(e)(1)(A) extended statute of limitations, account is not taken of an amount "which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item." This language of sec. 6501(e)(1)(A) is to be contrasted with the requirement of sec. 6661(b)(2)(B)(ii) that the return or attached statement adequately disclose "the relevant facts affecting the item's tax treatment." As disclosed in the text, Harrold did not disclose, indeed

tax is not subject to reduction, it is greater than $5,000 (said sum being greater than 10 percent of the tax required to be shown on the return) and accordingly the addition to tax under section 6661(a) is upheld.

In view of the conclusion we have reached on Harrold's failure to meet the disclosure requirements of section 6661(b)(2)(B)(ii), we need not consider respondent's alternative argument. It is that the understatement of tax will not be reduced even where all relevant facts are disclosed because Harrold's organization and use of Charter 38116 was a "plan or arrangement" of which the "principal purpose" was "the avoidance or evasion of Federal income tax" and thus fell within the definition of a "tax shelter" within the meaning of section 6661(b)(2)(C).[20] Under these circumstances disclosure does not serve to reduce the understatement.

## 6. *Award of Damages*

We next consider respondent's request for an award of damages under section 6673. That section provides that this Court shall award damages to the United States not in excess of $5,000 where it appears to the Court that the proceedings before it have been instituted or maintained primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless.

Petitioners in these cases were represented by competent counsel. They should have been fully aware that petitioners' cases did not differ in material facts from the plethora of other cases decided adversely to taxpayers in this and other courts involving so-called contributions to the Universal Life Church. Since 1980, this Court alone has considered more than 130 cases involving claimed charitable contributions to ULC Modesto substantially identical in nature to those at bar. The claimed contribution deduction has not been allowed in any of these cases. See, e.g., *Svedahl v. Commissioner*, 89 T.C. 245 (1987). The Court of Appeals for the Ninth Circuit, to which an appeal would lie in this case,

he misrepresented, the "relevant facts affecting the tax treatment" of the amounts he deposited into bank accounts he alone controlled and which he used to pay his personal living expenses.

[20]Cf. *United States v. White*, 769 F.2d 511 (8th Cir. 1985); *United States v. Savoie*, 594 F. Supp. 678 (W.D. La. 1984); *Shugarman v. United States*, 596 F. Supp. 186 (E.D. Va. 1984).

has decided at least six such cases: *Hall v. Commissioner*, 729 F.2d 632 (9th Cir. 1984); *Davis v. Commissioner*, 81 T.C. 806 (1983), affd. by unpublished opinion 767 F. 2d 931 (9th Cir. 1985); *Rager v. Commissioner*, 775 F.2d 1081 (9th Cir. 1985); *Kalgaard v. Commissioner*, 764 F.2d 1322 (9th Cir. 1985); *Smith v. Commissioner*, 800 F.2d 930 (9th Cir. 1986); *Svedahl v. Commissioner*, 811 F.2d 1509 (9th Cir. 1987); and in *Smith* imposed double costs and attorney's fees. As the Ninth Circuit stated in *Rager v. Commissioner*, *supra*, where we imposed damages under almost identical facts (775 F.2d at 1083), "Their transparent plan to frustrate the revenue by means of sham charitable deductions justified sanctions, and the appeal justifies further sanctions in this court." Petitioners here staked their cases upon the testimony of an expert on business associations that the *paper trail* indicated that the charters were an integral part of the ULC Modesto. However, petitioners and their representatives should have known, and we consider that they did know, that in a case like this one this Court will disregard the form of the transaction and apply the tax laws to its substance. *Gregory v. Helvering*, 293 U.S. 465 (1935). This rule applies regardless of whether the entity has a separate existence under State law. See *Zmuda v. Commissioner*, 79 T.C. 714, 720 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). We hold that petitioners' positions in these cases were frivolous and groundless.[21] See *Smith v. Commissioner*, 800 F.2d 930, 936 (9th Cir. 1986), and accordingly, we award damages in the amount of $5,000 to the

---

[21]We have, as stated in the opinion, held contrary to petitioners' position in over 130 cases in this Court alone. We have awarded damages to the United States in many such cases. The facts in the first of this long string of cases in which we upheld the disallowance of such contributions, *Abney v. Commissioner*, T.C. Memo. 1980-27, do not differ in any material respect from those now before us. Further, we note that the instant cases represent test or lead cases for several hundred other cases now pending in this Court. Accordingly, it appears reasonable to now apply the warning language we utilized in *McCoy v. Commissioner*, 76 T.C. 1027, 1029-1030 (1981), affd. 696 F.2d 1234 (9th Cir. 1983), regarding tax protesters, to those potential petitioners with disallowed deductions the same as those at bar:

"Such cases tend to disrupt the orderly conduct of serious litigation in this Court, and the issues raised therein are of the type that have been consistently decided against such protesters and their contentions often characterized as frivolous. The time has arrived when the Court should deal *summarily* and *decisively* with such cases without engaging in scholarly discussion of the issues or attempting to soothe the feelings of the petitioners by referring to the supposed 'sincerity' of their wildly espoused positions. [Emphasis added.]"

United States in docket No. 22943-83 and $5,000 in docket No. 9585-84.

*Decisions will be entered for the respondent.*

Reviewed by the Court.

STERRETT, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, WRIGHT, PARR, WILLIAMS, and WELLS, *JJ.*, agree with this opinion.

JACOBS, *J.*, concurs in the result.

GERBER, *J.*, did not participate in the consideration of this case.