KENNETH ALLEN AND BARBARA L. ALLEN, PETITIONERS
v. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 22877-84.          Filed January 5, 1989.

*Todd Russell Reinstein* and *William L. Feinstein,* for the
petitioners.
*Monica S. Melgarejo,* for the respondent.

1

GERBER, *Judge:* Respondent, in a statutory notice of deficiency dated June 11, 1984, determined a deficiency in petitioners' 1981 income tax of $4,541 and an addition under section 6653(a)(1)[1] for negligence of $227 plus 50 percent of the interest on the underpayment pursuant to section 6653(a)(2). The issues for consideration are generated by petitioners' contribution to the National Institute for Business Achievement. We must determine: (1) Whether any part of the claimed contribution is deductible under section 170; and (2) whether petitioners are liable for the additions to tax under section 6653(a) (negligence).

## FINDINGS OF FACT

Petitioners Kenneth and Barbara Allen resided in Saugus, California, at the time their petition was filed. The stipulation of facts and exhibits are incorporated by this reference.

### General Background

This case involves, inter alia, two nonprofit organizations founded by Gordon Bizar (Bizar): International Business Network (IBN) and the National Institute for Business Achievement (NIBA).

IBN, a nonprofit section 501(c)(6) organization, provides services such as education regarding the acquisition of small businesses and political lobbying on behalf of small business interests for its members. As part of its educational programs, IBN conducts seminars advising individuals how they can acquire small businesses with a very limited initial cash investment by using the assets of the business to be acquired. IBN also publishes a newsletter for its members. As a political lobbying organization, IBN has sponsored legislation at both the city and State levels to benefit small businesses. As a section 501(c)(6) corporation, IBN could not solicit contributions from the general public. Consequently, Bizar formed NIBA and transferred some of IBN's educational activities to NIBA, to be able to publicly fund the educational programs. IBN initially loaned NIBA approximately $160,000 to start its operations.

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

NIBA, a California nonprofit section 501(c)(3) tax-exempt foundation, provides education and training, typically in the form of conferences, in the techniques and skills necessary for small business ownership. Examples of conference topics are "How to Go Into Business," "How to Finance a Small Business" and "How to Manage and Administer." Conferences have been held in as many as 20 cities in a single year and as many as 1,500 people may attend conferences in a single city.

The Internal Revenue Service, by a letter dated October 21, 1980, stated that NIBA was an organization exempt from tax under section 501(c)(3) (exemption letter). This letter did not make a final determination of NIBA's foundation status under section 509(a), but it did allow NIBA to be treated as a publicly supported organization during the advance ruling period. Final exempt status was granted on November 29, 1982.

The National Diversified Funding Corporation (NDFC) is a for-profit corporation owned 60 percent by IBN and 40 percent by Bizar. Prior to 1980, NDFC engaged in various business activities, including the sale of insurance.

## The Contribution Transaction

Bizar devised a plan for eliciting contributions to NIBA from members of the general public. Bizar regarded the plan as a "trade secret," and at one time tried to interest larger charitable organizations in the plan.

As a "cornerstone" of the plan, the investor made a relatively small cash contribution,[2] and financed the remainder by means of a below-market interest rate loan. A document entitled "WHAT IS THE NATIONAL INSTITUTE FOR BUSINESS ACHIEVEMENT?" explained the program to potential investors:

The NIBA is a California non-profit publically [sic] supported educational foundation * * * .

*       *       *       *       *       *       *

The NIBA is organized under Internal Revenue Section [509 (a) (2)] and as such, contributors may deduct donations * * * . The NIBA then uses

---

[2]Terms such as "contribution" and "loan" are used for convenience, and do not necessarily reflect the Federal tax consequences of such transactions.

the earnings on these funds to finance free and low cost seminars to the general public * * * .

*     *     *     *     *     *     *

## THE CONCEPT

The National Diversified Funding Corporation (NDFC) will loan to a qualified borrower up to 90% of his contribution to the National Institute for Business Achievement (NIBA). Such Loan shall be made consistent with the lending policies of NDFC.

It is the purpose of the lender to aid the institute.

## THE TERMS OF THE LOAN

1. Up to 90% of the Contribution.
2. Interest Rate: 3% per annum.
3. Interest Payable: [Quarterly].
4. Repayment: Principal due in 20 years.

*     *     *     *     *     *     *

## THE MECHANICS

1. Contributor completes the enclosed loan application (Exhibit A) and returns it with a current financial statement and a copy of last year's tax return.

2. Upon approval of credit, NDFC meets contributor and spouse (if married) at its bank.

3. Contributor and spouse sign the attached note (Exhibit B) for the amount of the loan.

4. NDFC issues check payable to the contributor for the loan proceeds.

5. Contributor endorses check (above) and exchanges it for a cashier's check payable to NIBA which is then given to a NIBA representative.

*     *     *   .   *     *     *     *

## EXAMPLE

[Contributor has $200,000 gross income, 55.5% tax bracket (State and Federal), $100,000 NIBA contribution. The contribution would generate a net cash surplus (from tax savings) of $45,000.]

1. If $23,726 were invested at 10% after tax return, it would yield enough cash to pay after tax interest cost on note plus pay off note at end of 20th year. This would leave $21,774 of discretionary cash available to contributor at this time.

2. If entire $45,000 were to be invested at a 10% after tax return, the amount available to pay off $90,000 loan in 20 years is $306,101.

*     *     *     *     *     *     *

## QUESTIONS AND ANSWERS

*     *     *     *     *     *     *

2-Q Why is Lender willing to loan money at such low interest rates?

2-A Lender has been able to obtain low cost funding from other organizations that are interested in aiding in the growth of NIBA.

\* \* \* \* \* \* \*

5-Q Is the note to NDFC secured in any way?

5-A No. However, NDFC will conduct a credit check to verify qualification for a loan.

\* \* \* \* \* \* \*

9-Q How long does this take to set up?

9-A Once we have received a copy of either your last year's tax return or a current personal financial statement for approval of credit, we will set up an appointment to meet you at our bank. It normally takes 48 hours to approve your credit and 20 minutes to transfer papers and cash at our bank.

In addition, a loan application attached to the note included a statement that the purpose of the loan was to make a charitable gift to NIBA. The materials did not name the entity(ies) willing to make low-cost funding available to contributing investors. Neither NDFC nor Bizar would answer any inquiries regarding the source of the loans. Petitioners did not make any such inquiries. The investor's contribution of the proceeds was a condition for obtaining the loan. Although NDFC required petitioners to provide credit references, no outside credit reporting agency was consulted.

Bizar and NIBA were able to make this program work through a circular flow of funds. In essence, NIBA, itself, was the source of the low-cost funding. The funding behind the program flowed in the following manner. NIBA was apparently the source of the original funds.[3] It would loan money to IBN on a short-term basis, at a rate of interest of 2½ percent. These loans were intended to be repaid within 3 to 5 years. Then, IBN would loan the money to NDFC, for a 20-year term at a 2½-percent-interest rate. These funds would then be loaned to investors at the 3-percent rate. An investor's contribution to NIBA would start the circle over again, and NIBA would loan the newly contributed funds to IBN, IBN to NDFC, NDFC to an investor, and so forth. The amount of contributions NIBA was willing to accept de-

[3]Because of the "chicken and egg" nature of the flow of funds, it is difficult to determine where the original "seed" funds originated.

pended upon the amount of income IBN could generate to repay the loans within 3 to 5 years.

NIBA and NDFC discontinued the lending program in 1984 due to the enactment of section 7872 ("Treatment of Loans with Below-Market Interest Rates"). At that time, IBN owed NIBA approximately $6 million in short-term loans. IBN and NDFC held a like amount of loans, for a 20-year term, from NDFC and investors, respectively. Since that time, IBN has repaid over one-half of those loans to NIBA, the source of those repayments being IBN membership dues.

On December 28, 1981, petitioner[4] Kenneth Allen cashed a $2,500 check from his business account at the Bank of America, and purchased a $2,500 cashier's check with NIBA designated as payee. On December 29, 1981, at Metrobank, petitioner signed a recourse promissory note in the amount of $22,500, payable to NDFC. The note was unsecured, principal was due in 20 years, and interest-only payments were due quarterly at 3-percent simple interest per annum. Petitioner then received a check for $22,500 from NDFC which he endorsed and used to purchase a cashier's check in the same amount, with NIBA designated as payee. Petitioner then remitted the two cashier's checks, for $22,500 and $2,500, to NIBA. At the time petitioner remitted the cashier's checks, he intended to donate those amounts to further the charitable goals of NIBA. The funds for the loan to petitioner had originated with NIBA and had passed through IBN and NDFC to petitioners.

Petitioner is current in his interest payments on the note. Petitioner intends to repay the note, and NDFC intends to collect on all the notes. No contributions were made to NIBA without a NDFC loan being involved in the transaction. There were likewise no contributions made which consisted entirely of a NDFC loan. There were no instances where NDFC made loans to individuals who were not NIBA contributors or where an individual took a NDFC loan and then did not participate in the NIBA contribution program. Three to nine percent of loaned amounts were paid by NIBA to NDFC as commissions for "finding" the contributors.

---

[4]Petitioner, when used in the singular, refers only to petitioner Kenneth Allen.

OPINION

The main issue for our consideration is whether petitioners are entitled to deduct as charitable contributions under section 170: (1) $2,500 paid to NIBA from petitioner's funds; and (2) $22,500 paid to NIBA that was "borrowed" from NDFC.

Deductions are a matter of legislative grace, and taxpayers must satisfy the specific statutory requirements of the deductions they claim. *Deputy v. du Pont,* 308 U.S. 488 (1940); *New Colonial Ice Co. v. Helvering,* 292 U.S. 435 (1934). Taxpayers bear the burden of proving entitlement to the deductions they claim. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a). These rules apply with equal force to deductions claimed for charitable contributions. Thus, petitioners must prove that they made a contribution or gift to or for the use of an entity described in section 170(c), payment of which is made within the taxable year. Sec. 170(a)(1).

Petitioners contend that they are entitled to a charitable contribution deduction because they made a cash contribution to NIBA, an organization described in section 501(c)(3). The Service had issued an exemption letter to NIBA, which petitioners argue they were entitled to rely upon. Sec. 1.509(a)-7(a), Income Tax Regs. In addition, it is respondent's own position that amounts borrowed from a third party and contributed to a charity are nonetheless deductible. See Rev. Rul. 78-38, 1978-1 C.B. 67.

Petitioners contend that they have satisfied their burden, notwithstanding any tax-avoidance motivation. "[T]he deduction for charitable contributions was intended to provide a tax incentive for taxpayers to support charities. Consequently, a taxpayer's desire to avoid or eliminate taxes by contributing cash or property to charities cannot be used as a basis for disallowing the deduction for that charitable contribution." *Skripak v. Commissioner,* 84 T.C. 285, 319 (1985).

Respondent argues that the loan portion of the contribution is not deductible because the funds originated with the claimed donee and went around in a circle. The essence of respondent's position is that this transaction was not at arm's length and should be disregarded under a form-

versus-substance type analysis. He argues that three conditions must be met before a borrowed contribution is deductible: (1) The funds must originate with an independent lender; (2) the funds must be actually and unconditionally delivered to the charity; and (3) the charity must benefit from receipt of the funds. Respondent also argues that the 10-percent cash portion contributed by petitioner is not deductible because it was, in substance, a fee for participation in the loan/contribution program.

The substance of a transaction, not the form, controls for tax purposes. *Gregory v. Helvering,* 293 U.S. 465 (1935). The determinative question is "whether what was done, apart from the tax motive, was the thing which the statute intended." *Skripak v. Commissioner, supra* at 319, quoting *Gregory v. Helvering, supra.* Thus, while we agree with petitioners' contention that they may rely on the determination letter of NIBA's exempt status, that reliance does not insulate the transaction from further scrutiny. The transaction in its entirety must be examined in a realistic economic sense to determine the tax consequences. NIBA's recognition as a qualified donee for purposes of section 170 does not preclude our inquiry into whether any amount was actually paid to or received for the benefit of NIBA.

We have looked to a number of factors to determine whether payment of a charitable contribution has been made. Included in these is whether the charity actually received the gift and whether the purported gift had any value. See *Skripak v. Commissioner, supra.* In the case of property contributions, we must consider, as we did in *Skripak v. Commissioner, supra,* the value of the property to determine the amount of the contribution. Likewise, where a taxpayer claims a deduction for a contribution of money or property of value to an organization, we must consider whether the taxpayer parted with and the donee received property or money. In the circumstances of this case, the donee did not receive a benefit from the loan portion of the claimed contribution.

With respect to the contribution program, the three Bizar-related entities, NIBA, IBN, and NDFC, worked as a functionally integrated whole and, as a consequence, were not at arm's length for purposes of the transaction in

question. Consequently, the net effect of petitioner's $22,500 promissory note to NDFC was a mere promise to pay that amount to NIBA. See Rev. Rul. 78-38, *supra.* The amount in question is therefore not deductible by petitioner in his 1981 taxable year. Thus, except with respect to the cash portion of a contribution, the unit was not enriched by a donor's "contribution." The same money was recycled again and again, through the money circle, with essentially no new infusions of cash. Section 170 allows a deduction for "payments" of charitable contributions. In this case, payment would not ultimately be received by the Bizar entities for 20 years. With the possible exception of petitioner's $2,500, NIBA and the interrelated group of entities were in exactly the same position after the contributions as if no contributions had been made.

Gordon Bizar testified that the purpose of NIBA was to transfer educational programs to an entity that could receive public support. Absent public support, IBN would have to fund NIBA's educational programs out of membership dues. With the circular flow of money in this case, NIBA did not have funds of its own. It relied on IBN repaying its "loans," which, not surprisingly, were paid out of membership dues. The amount of contributions NIBA was willing to accept was keyed expressly to IBN's ability to pay. The money from IBN did not come from contributions, since those notes would not be repaid for 15 to 20 years. Because NIBA was not enriched to any significant extent by the entire contribution program, petitioners claimed contribution, to the extent of the "borrowed" portion, is not deductible. As previously stated, the test in *Gregory v. Helvering* is if what was done is what the statute intended. In *Skripak v. Commissioner, supra,* we held that the charity actually received books and, accordingly, the statutory purpose was accomplished. Here, the charity did not receive the benefit of the portion purportedly borrowed by petitioner where it was part of a circuitous flow under which NIBA was essentially being funded by IBN. Thus, deductions claimed which were based upon the money borrowed from NDFC are not allowable.

Petitioners argue that the exemption letter issued to NIBA, plus proof that NIBA received the full amount of both

cashier's checks, should be a shield against any determination by respondent that a charitable gift is invalid. See sec. 1.509(a)-7(a), Income Tax Regs.[5] See also *Cooper v. Commissioner*, T.C. Memo. 1987-431; Rev. Proc. 72-39, 1972-2 C.B. 18. If we were considering unconditional cash contributions, we would agree with petitioners' position. However, the letter of exemption does not cure the lack of an actual contribution.

As previously indicated, petitioners must establish entitlement to charitable deductions. This includes proof that the organization was a qualified donee *and* that payment of the contribution to such donee occurred within the taxable year. The exemption letter issued by respondent insures that NIBA was a "qualified donee" and that petitioner could rely upon that status. Petitioners continue to bear the burden of proving that payment of the contribution to NIBA has been made. See *Burwell v. Commissioner*, 89 T.C. 580 (1987); *Svedahl v. Commissioner*, 89 T.C. 245 (1987); *Wedvik v. Commissioner*, 87 T.C. 1458 (1986). This is normally a routine matter where payment is made by cash, check, credit card, or the like. Although, at first glance, it appears that petitioner made a "cash" payment by means of $25,000 in certified checks, that was not the case. Petitioners should have been wary under the circumstances of this case, where the contribution and loan were part of a single package, the principal was not payable for 20 years, the loan was at rates below market, and the source of financing was an undisclosed third party.

The NIBA transactions were part of a highly integrated, purposefully structured program. Each transaction was the amalgam of an interdependent series of steps—cash contribution, low-interest loan, and contribution of the loan proceeds. The exact mechanics of a donation were laid out in the promotional materials, down to exchanging the

---

[5]The regulation states:

Once an organization has received a final ruling or determination letter classifying it as an [exempt] organization * * * the treatment of * * * contributions * * * to such organization under sections 170 * * * will not be affected by reason of a subsequent revocation by the Service of the organization's [exempt] classification [until public notice of such revocation, such as in the Internal Revenue Bulletin] * * *.

To our knowledge, there has not been a revocation of NIBA's exempt status.

cashier's checks. No contributions were made without an accompanying NDFC loan.

The low interest financing (made available by a related third party) was made expressly or impliedly on condition that the proceeds were donated to NIBA. According to the plan, and as was the case with petitioners, the donor held the funds for less than 20 minutes, and was not more than a conduit. Petitioners urge that they were free to dispose of the loan proceeds in any manner, because the note contained no conditions. We do not believe that petitioners could have walked away from Metrobank without transferring the note proceeds as directed.

The final factor is that the loans were available at rates significantly below market and were unsecured. This indicates some person or entity other than petitioners bore the brunt of the economic costs associated with the contribution. The promotional materials stated that the low-interest financing was made available by organizations interested in aiding the growth of NIBA.

In cases involving tax shelters lacking in profit objective, we have stated that taxpayers should not have ignored the fact that they received tax credits in excess of their original cash investment. See *Soriano v. Commissioner*, 90 T.C. 44 (1988). Analogously, petitioners should have been on notice that their charitable deductions would be subject to scrutiny where the tax savings were approximately twice their cash investment. The innovative financing in this transaction was not contemplated in the exemption letter, and it is appropriate to subject the transaction to further examination.[6]

With respect to the $2,500 originating with petitioners, they have established that these were their own funds unconditionally donated to NIBA, a section 501(c)(3) organization to which contributions are deductible. Petitioners did not, contrary to respondent's arguments, receive anything of value in return for their contribution. Cf. *DeJong v. Commissioner*, 36 T.C. 896 (1961), affd. 309 F.2d 373 (9th Cir. 1962). Here, petitioner contributed $2,500 with the

---

[6]Normally, contributors to qualified donees would not need to look beyond the qualified status of such donees. However, petitioners in this case were exposed to numerous "red flags" which should have aroused their curiosity concerning the donative transaction before they claimed a deduction against their income.

intent to further NIBA's charitable goals. Cf. *Marquis v. Commissioner*, 49 T.C. 695, 702 (1968). Therefore, this amount is deductible.

The final issue is whether petitioners are subject to the addition for negligence under section 6653(a)(1) and (2). Negligence, within the meaning of that section, has been defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Neely v. Commissioner*, 85 T.C. 934, 947 (1985). While petitioners have established that they did not know and could not find out about the circular flow of money, the circumstances under which they received the funds to make the "contribution" should have made them suspicious. The low-interest loan, the "packaging" of the program, and the tax benefits in excess of the cash investment should have put petitioners on notice that something was amiss. Thus, the additions for negligence should be imposed.

To reflect the foregoing,

*Decision will be entered under Rule 155.*