SCOTT E. SLAYBACK, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Slayback v. Commissioner
Docket No. 41972-86
United States Tax Court
T.C. Memo 1990-200; 1990 Tax Ct. Memo LEXIS 217; 59 T.C.M. (CCH) 442; T.C.M. (RIA) 90200; April 19, 1990
Scott E. Slayback, Jr., pro se. Willie Fortenberry, for the respondent. *219 PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Taxable
Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661
1982
$  7,349
$  3,675
50 percent of
None
the interest due
on $ 7,349
1983
20,674
10,360
50 percent of
* $ 1,531
the interest due
on $ 20,674
In his answer, respondent alleged, as an alternative to the additions to tax for fraud, that petitioner is liable for additions to tax under sections 6651(a)(1), 6653(a)(1), and 6653(a)(2). Respondent also alleged that the addition for a substantial understatement under section 6661 should be computed at the rate of 25 percent of the underpayment attributable to the understatement, rather than the 10 percent determined in the deficiency notice. Also in his answer, respondent sought increased interest under *220 section 6621(c) (formerly section 6621(d)) for substantial underpayments attributable to tax-motivated transactions for both years and damages under section 6673. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in question, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues to be decided are: 1. Whether petitioner failed to report gross receipts from his Schedule C operations for the years 1982 and 1983 in the amounts of $ 6,700 and $ 20,227, respectively; 2. Whether petitioner failed to report additional income of $ 28,324 received in 1983 as a result of his income-producing activities conducted through an alleged partnership entity known as Economic Concepts, Ltd.; 3. Whether petitioner is entitled to the business expense deductions [1] claimed on his Schedule C for the years 1982 and 1983 in the amounts of $ 16,998 and $ 2,282, respectively; 4. Whether petitioner is liable for additions to tax under section 6653(b) for each of the taxable years 1982 and 1983 for fraud; 5. In the alternative to the additions to tax under section 6653(b), *221 whether petitioner is liable for additions to tax under section 6651(a)(1), under section 6653(a)(1), and under section 6653(a)(2) for each taxable year; 6. Whether petitioner is liable for increased interest for the taxable years 1982 and 1983 under section 6621(c) (formerly section 6621(d)) for substantial underpayments attributable to tax-motivated transactions; 7. Whether petitioner is liable for a 25 percent addition to tax for the taxable year 1983 under section 6661 for substantial understatement of tax; and 8. Whether damages should be awarded to the United States under section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and accompanying exhibits are incorporated herein by this reference. At the time Scott E. Slayback, Jr. (hereinafter petitioner) *222 filed his petition, he resided at 952 Blackwood Street, Altamonte Springs, Florida 32701. On or about August 1, 1983, respondent's service center received petitioner's Form 1040 for 1982. On April 26, 1984, respondent's service center received petitioner's Form 1040 for 1983. Although petitioner was married, he filed separate returns for each taxable year. Petitioner had not requested or received any extensions of time for the filing of his 1982 and 1983 individual tax returns. Petitioner styles himself as a financial management consultant. He advises and counsels his customers or clients on securities, insurance, real estate, mortgages, taxes, and contracts. During the years before the Court he was a securities dealer/broker, but has now let his license lapse. While he was serving as a securities dealer/broker, he dealt in mutual funds and tax shelters, including cattle shelters, gas and oil shelters, and coal shelters. Besides working as a securities dealer/broker, petitioner has had many years' experience as a licensed insurance agent and as a licensed mortgage broker. Petitioner also has had 14 to 15 years' experience as a tax return preparer. In the last several years, *223 including the years before the Court, petitioner has concentrated on his tax return preparation business. [2] For the last several years, he has prepared on the average of 200 tax returns per year. His fees for preparing tax returns began at $ 40 an hour, but increased over the years to $ 60 to $ 75 an hour. In the course of his financial counseling and tax return preparation, petitioner has assisted some of his customers or clients in setting up a local charter or local church of the Universal Life Church. The local charter or local church number is issued by the Universal Life Church, Inc., located in Modesto, California (hereinafter referred to as "ULC Modesto"). Petitioner himself has a local charter or local church, No. 49593, whose address is his residence on Blackwood Street in Altamonte Springs, Florida (hereinafter referred to as "petitioner's ULC" or "petitioner's local church"). [3] Petitioner *224 also has documents from ULC Modesto describing him as a "Bishop" and as a "ULC Membership Counselor." Petitioner styles himself as a "Bishop - Administrator" of ULC. There are no members or congregation of petitioner's local church. There is no evidence of any meetings or of any other activity of petitioner's ULC except for petitioner's ULC bank account. In 1982 petitioner opened an account at ComBank of Winter Park, Florida, account No. XXXXX6680, in the name of Universal Life Church, Inc. In 1983, the name of that bank was changed to Freedom Savings and Loan Association, but the account number was unchanged. At all times petitioner had the sole signature authority on his ULC bank *225 account. [4] Petitioner deposited some of his fees from his financial counseling and tax return preparation business into that bank account, but most of the deposits into that account were fees paid by "new ministers" recruited by petitioner, as will be discussed below. Petitioner used the funds in that bank account to pay some of his personal living expenses, which he characterizes as a "parsonage allowance." Petitioner's wife would not permit him to make the mortgage payments on the family residence out of his local church bank account, so petitioner instead wrote a check to himself for a lump-sum amount that covered the mortgage payment and other expenses. Petitioner paid his telephone and utility bills from his local church bank account. Also, petitioner wrote checks on that account to a dentist, to himself, to VISA, to American Express, and to MasterCard. Petitioner used his ULC bank account to pay many of his personal expenses. During 1982, deposits *226 into petitioner's ULC bank account No. XXXXX6680 totaled $ 8,200, none of which was reported on petitioner's tax return for that year. [5] During 1983, deposits into account No. XXXXX6680 (sometimes written as XX-668-0) totaled $ 23,334.44, and after deductions for transfers, there were net deposits of $ 20,634, none of which was reported on petitioner's 1983 tax return. [6]
*227 When petitioner recruited a "new minister," he assisted that individual in setting up his own local church bank account. However, the person would pay petitioner a fee ranging from $ 1,000 to $ 1,500 to $ 2,000, the check for that fee being written on that person's personal bank account, made payable to "Universal Life Church," and marked as a "donation." [7] That "new minister" usually, but not invariably, deducted that amount on his personal tax return as a charitable donation. While petitioner may have sent some of the checks to ULC Modesto, he deposited many of them into his own ULC bank account No. XXXXX6680. See n.7, supra. In December of 1982, petitioner allegedly created a partnership *228 in the name of Economic Concepts, Ltd., in which petitioner was allegedly the general partner with a 25 percent ownership in the profits and in which Universal Life Church, Inc. was allegedly the limited partner with a 75 percent ownership in the profits. [8]ULC Modesto had no knowledge of that purported partnership. There is no persuasive or probative evidence in the record to establish that ULC Modesto ever entered into a partnership with petitioner. If there was a partnership at all, the limited partner was petitioner's own local church, No. 49593. Petitioner prepared and filed a Form 1065, partnership information return, in the name of Economic Concepts, Ltd., for the period October 1, 1982 through September 30, 1983. That Form 1065 reported total income of $ 25,505.64, claimed total deductions of $ 21,014.37, and net income of $ 4,491.27. There is no evidence to support these figures. The K-1's attached to the Form 1065 allocated *229 $ 3,368.45 of the $ 4,491.27 net income to ULC Modesto and $ 1,122.82 to petitioner. There is no evidence that ULC Modesto ever received or exercised any dominion or control over that $ 3,368.45. In January of 1983, petitioner opened a bank account at the Barnett Bank in Altamonte Springs, Florida, account No. XXXXXX4890, in the name of Economics Concepts, Ltd. In account No. XXXXXX4890, there were total deposits of $ 43,964.74 in 1983, and net deposits (after reductions for transfers) of $ 34,255. [9] Respondent determined business expenses of $ 4,808.39, and net income of $ 29,446.61, of which petitioner reported as income only $ 1,122.82. The record does not explain the particular expenses included in that $ 4,808.39 figure. However, most of the checks written on that Economic Concepts, Ltd. bank account appear to be for personal expenses and cannot be identified as business expense relating to petitioner's income-producing activities of financial consulting, tax return preparation, or setting up local ULC churches. *230 In both 1982 and 1983 petitioner had signature authority on bank account numbers XX371-1US and/or XXXX5002 at the Bank of Nova Scotia, Georgetown, Grand Cayman Island. During 1983, petitioner wrote checks on that foreign bank account to Economic Concepts, Ltd. Those checks in the amount of at least $ 5,850 were collected by or deposited in Barnett Bank account No. XXXXXX4890 in the name of Economic Concepts, Ltd. Petitioner contends that those amounts were part of the gross income reflected on the Form 1065 in the name of Economic Concepts, Ltd., but there is no persuasive or probative evidence in the record to support that contention. On his own tax return for 1983, petitioner failed to answer the question on Schedule B in regard to foreign bank accounts. [10]
*231 Petitioner had another bank account at the Barnett Bank (account No. XXXXXX2894) in his own name and in the name of his son, Scott Slayback III. In account No. XXXXXX2894, there were net deposits (total deposits less transfers) of $ 2,381 in 1983, no part of which was reported on petitioner's 1983 tax return. [11]
In 1982, petitioner reported no taxable income, reporting only a net loss of $ 1,075.76 from his Schedule C. Petitioner reported gross receipts of $ 15,921.87 from insurance sales and deductions totaling $ 16,997.63. There is no evidence in the record to support either the gross receipts figure or any of the deductions claimed. For 1983, petitioner reported *232 business income (Schedule C) of $ 505.45 and income from Economic Concepts, Ltd. of $ 1,122.82. On his Schedule C, he listed gross income of $ 2,787.64 and total deductions of $ 2,282.19. There is no evidence in the record to support any of the deductions claimed on the Schedule C, except in regard to an automobile petitioner used in his various fee-producing activities (financial counseling, tax return preparation, and setting up local ULC churches). On January 27, 1983, petitioner purchased a new automobile for a total price of $ 7,519. On his return for 1983, petitioner claimed an investment tax credit of $ 759.50 and a depreciation deduction of $ 1,139.25, both computed on a purported cost basis of $ 7,595. On his Schedule A for 1983, petitioner claimed total itemized deductions of $ 3,299.03, including, among other things, medical expenses of $ 1,021.45, home mortgage interest of $ 1,632.77, and cash charitable contributions of $ 505. On that 1983 return, petitioner reported and paid only self-employment tax of $ 47.26 on his reported Schedule C income of $ 505.45. Petitioner failed to report substantial amounts of taxable income during each of the years before the Court. *233 [12] Petitioner also counseled and advised other taxpayers in regard to the use of a local ULC church to avoid Federal taxes. He encouraged other taxpayers to establish their own local ULC churches and bank accounts. He also prepared individual income tax returns that claimed charitable contributions deductions for amounts that went into petitioner's own ULC bank account or into a local ULC bank account over which the particular taxpayer had sole signatory authority. However, the record does not show that petitioner himself claimed any charitable contributions deductions either to ULC Modesto or his own ULC local church. *234 In April of 1984, Special Agent Guerry Hersey was assigned to assist in an investigation of petitioner. Agent Hersey was and is currently employed with the Criminal Investigation Division of the Internal Revenue Service in Panama City, Florida. Agent Hersey assumed an undercover role in his dealings with petitioner. On April 15, 1984, Hersey met petitioner at petitioner's office. Hersey posed as an individual who was interested in ULC. Petitioner informed and advised Hersey that he was not an attorney, but bragged that he had practiced law for 20 years without a license. Petitioner also boasted that the bar association had not caught up with him with respect to his practicing law. Petitioner told Hersey that he styled himself as a ULC Membership Counselor. Petitioner's fee, as such a counselor, was $ 60 per hour. Petitioner told Hersey that he was operating six or seven churches out of a post office box. He also assured Hersey that there was no need for a physical building or specific location for a ULC. Petitioner told Hersey that if he earned over $ 17,000 annually, that by forming his own ULC church, he could use "this scheme to cut down" his taxes. Petitioner also *235 advised Hersey that if he had tax withholding, he should change his W-4 form from the current status, and to list "single" and "14" withholding allowances. According to petitioner this adjustment would stop most of the withholding, but a number in excess of 14 would trigger an automatic inquiry by the Internal Revenue Service. In addition to the withholding adjustment, petitioner recommended to Hersey that he open two checking accounts, one a personal account in his own name and the other in the name of his individual ULC. [13] Petitioner told Hersey to pay the membership fee of $ 1,500 from his personal account. For the $ 1,500 membership fee, petitioner would accompany Hersey to open up his church account, would advise him and would obtain documentation from ULC Modesto. The membership fee was not a fee to ULC Modesto, but instead served as a fee for petitioner's services. Petitioner emphasized to Hersey that the money in fiction was going to the church, but in truth the money was going to petitioner. Petitioner told Hersey that in the event he was audited, he (petitioner) would also assist him in the audit and would attend the audit with him. In other words, petitioner told *236 Hersey, "[i]t was an overall plan." Once Hersey paid the ULC membership fee and established his own local ULC, petitioner told him he would handle everything completely, including Hersey's tax returns. Petitioner advised Hersey that a period of approximately one month would be necessary to establish his own local church. Once the documentation and records arrived from ULC Modesto, Hersey could establish his own local church bank account. However, the first check had to come from Hersey's personal account, and was to be deposited into a church account over which petitioner had control. Petitioner also advised Hersey that he should obtain a stamp reading "Universal Life Church," to stamp the checks for deposit. The designated nomenclature on the rubber stamp was the Universal Life Church, account number XYZ. Neither *237 the charter number, petitioner's client file number, nor the name of Guerry P. Hersey was to appear on the stamp. Petitioner also said he preferred to be identified as a secretary on all the churches he helped to establish, so he could prepare and handle an audit, if the Internal Revenue Service were to audit the local church. Petitioner informed Hersey that he could donate up to 50 percent of his salary to his (Hersey's) own local church, and in turn his local church could pay Hersey's basic living expenses, including, if he so desired, a Club Med vacation. Petitioner also discussed with Hersey other personal expenses which he could allegedly "deduct," such as travel and medical expenses, appliance expenses, and other expenses associated with the home such as rug cleaning, and phone bills. Petitioner told Hersey that since the treatment of personal living expenses as purported parsonage allowances and the whole ULC arrangement was viewed by the Internal Revenue Service as a tax scam, when he claimed the annual charitable contributions deduction on his tax return, he (Hersey) should simply list "church," not ULC, on his Schedule A. Petitioner suggested to Hersey several alternative *238 methods of handling payment of his living expenses. First, petitioner suggested Hersey could establish his own personal ULC bank account, "donate" money to his ULC bank account, which he could deduct as a charitable donation, and then use that church bank account to pay his personal living expenses. Second, petitioner suggested Hersey could write a check to ULC Modesto, and then have ULC Modesto write checks for Hersey's personal living expenses. Using this particular option, petitioner told Hersey that he could deduct the payments to ULC Modesto as charitable deductions, thus effectively deducting his living expenses, such as his mortgage or rent and utilities, including water, electricity, and gas. This particular option, petitioner said, would cost Hersey an additional two percent, plus 50 cents per check written by ULC Modesto. ULC Modesto had a fee charge of 50 cents per check, plus two percent of the total membership fees or payments the person sent to ULC Modesto. A third alternative, petitioner suggested, was for petitioner to pay Hersey's living expenses. In other words, Hersey would send petitioner money as a "donation" to petitioner's local church, deduct that "donation" *239 as a charitable contributions deduction, and then petitioner would pay out of his church bank account Hersey's personal living expenses, less two percent, as well as 50 cents per check for this service. Petitioner recommended alternative two, the ULC Modesto option. Petitioner told him that this option was a better way to "stop the IRS." Petitioner told Hersey about his own ULC "parsonage allowances." He told Hersey that his wife would not allow him to make their mortgage payment through his own ULC bank account, but petitioner wrote a check to himself on his ULC bank account in an amount to cover the mortgage payment as a monthly allowance from his local ULC bank account. Petitioner also showed Hersey a pen, known as a Copy-Not pen, which petitioner recommended Hersey use. Petitioner advised Hersey as well as other prospective ULC "ministers" to use a certain type of ball point pen or ink pen to impede the copying of documents. Petitioner also recommended use of blue ink on blue checks to prevent the blue ink from being copied on microfilm. Thus, petitioner suggested that when the Internal Revenue Service issued a subpoena or summons to the bank, the Service would not be *240 able to obtain copies of the checks. Petitioner also told Hersey that if the Internal Revenue Service were to audit individual income tax returns of one of petitioner's clients, petitioner's objective was to obstruct the Internal Revenue Service as much as possible and to make each Internal Revenue Service audit an adventure. According to petitioner, it was his desire to make the Internal Revenue Service work on one of his audits for an entire year. As an example of his tactics, petitioner said he would intentionally mix up or disorganize the records his client presented to him. Petitioner would then present these disorganized records to the Internal Revenue Service, so the Service would have the problem of straightening out and reorganizing all the receipts that were previously mixed up or disorganized by petitioner. Petitioner also explained to Hersey a procedure to avoid paying self-employment tax. He told Hersey that his own annual compensation was between $ 15,000 and $ 16,000 per year, but he would report less than $ 400 per year, so he would not have to pay any social security taxes. Petitioner also explained to Hersey how he used his partnership with his local church. *241 For instance, if the partnership had $ 3,000 in income, petitioner received $ 750 of the amount which represented his 25 percent interest and his ULC church received the remaining $ 2,250, representing the 75 percent interest his ULC church purportedly had as a limited partner. Petitioner explained to Hersey that his ULC church did not pay any taxes, and thus he would not pay any taxes on 75 percent of the income. Thus, petitioner explained that he avoided paying not only his social security taxes, but also his Federal income taxes by claiming his local ULC church as a partner in the partnership. OPINION This case presents another twist to the usual Universal Life Church (ULC) case. Unlike the usual "ULC" case, petitioner did not deduct alleged "donations" or "contributions" to either ULC Modesto or to his own local ULC church. Petitioner, a financial adviser and tax return preparer, would help his client set up his own local ULC church and open a bank account for his local ULC church over which the client had sole signatory authority. The client would deposit up to 50 percent of his income in his local church account, claim that amount as a charitable donation, and then use *242 his local church bank account to pay his (the client's) mortgage or rent and other personal living expenses. That is the usual scenario in the ULC cases that have come before this Court. See Dew v. Commissioner, 91 T.C. 615, 622-623 and cases collated in n.9 at 626 (1988); Burwell v. Commissioner, 89 T.C. 580 (1987) and cases cited therein; Davis v. Commissioner, 81 T.C. 806 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985). Petitioner, too, had his own local ULC church and his own local church bank account over which he had sole signatory authority. Into his church account, petitioner deposited some of his earnings as a financial adviser and tax return preparer and certain initial "contributions" or "donations" petitioner received from his clients. Petitioner would have his client write a check on his [the client's] personal bank account in the amount of $ 1,000, $ 1,500, or $ 2,000, payable to "Universal Life Church" and marked as a "donation" or "contribution." These checks were deposited into petitioner's ULC bank account over which petitioner alone had control and dominion. While ostensibly *243 charitable "contributions" or "donations," these amounts were really fees for petitioner's services. The amounts deposited into petitioner's local church bank account, whether fees for his services as a financial adviser or tax return preparer or fees for helping his clients set up their own local ULC churches, were not reported on petitioner's tax returns. Instead petitioner treated this as the income of a tax-exempt church. Petitioner followed that practice in both 1982 and 1983. For the year 1983 petitioner also used a partnership, Economic Concepts, Ltd., in which petitioner was allegedly the general partner with a 25-percent interest and his local ULC church was allegedly the limited partner with a 75-percent interest. The fees for petitioner's services as a financial adviser and tax return preparer were deposited into the bank account of Economic Concepts, Ltd., over which petitioner had the sole signatory authority. Petitioner then treated only 25 percent of the net income as his income and treated 75 percent of this income as income of a tax-exempt "church." To sum up, rather than claiming charitable contributions deductions as in most ULC cases and as did many of *244 his clients, petitioner instead treated the fees he earned as income of his ULC church, thus excluding most if not all of his income in 1982. This practice was also followed in 1983, but in that year, petitioner in addition effectively excluded 75 percent of the alleged partnership income, again treating it as income of ULC Modesto or his purportedly tax-exempt local ULC church. Thus, this case involves an attempted assignment of income as well as the status of petitioner's local ULC church as a separate tax-exempt entity vel non. I. UNREPORTED INCOME The money deposited into petitioner's ULC bank account really represented fees earned by petitioner for his services of financial counseling, preparing tax returns, and setting up local ULC churches for his clients. Similarly, the money deposited into the Economic Concepts, Ltd. bank account also represented fees earned by petitioner as a financial counselor and tax return preparer. It is a basic principle of Federal tax law that income is taxable to the person who earns it, and attempts to assign that income to some other individual or *245 entity are unavailing. United States v. Basye, 410 U.S. 441, 449 (1973); Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949); Lucas v. Earl, 281 U.S. 111 (1930). Here petitioner earned the income and it is taxable to him. Petitioner does not contend that he earned the income as the agent of ULC Modesto or his local ULC church, and we need not address principles of agency law and issues as to who earned the income. See Schuster v. Commissioner, 84 T.C. 764 (1985), affd. 800 F.2d 672 (7th Cir. 1986). See also Fogarty v. United States, 780 F.2d 1005 (Fed. Cir. 1986). Here, the facts clearly establish that petitioner earned the income in his individual capacity, and any argument to the contrary would be wholly frivolous. See Page v. Commissioner, 823 F.2d 1263 (8th Cir. 1987), affg. a Memorandum Opinion of this Court; Pollard v. Commissioner, 786 F.2d 1063 (11th Cir. 1986), affg. a Memorandum Opinion of this Court; McGahen v. Commissioner, 76 T.C. 468 (1981), affd. without published opinion 720 F.2d 664 (3d Cir. 1983). *246 Moreover, even if petitioner had argued that he earned this income as an agent of his local ULC church, he has not established that there exists a legal entity separate and apart from himself and if there were such a separate legal entity that it was a tax-exempt entity under either section 170(c)(2) or section 501(c)(3). Petitioner, like so many taxpayers in other ULC cases, trots out the shopworn argument that there is only one Universal Life Church and that his local church is part of it. While ULC Modesto itself was a tax-exempt entity during the years involved in this case, [14]ULC Modesto's exemption was not a group exemption and did not apply to the local chapters or local churches such as petitioner's ULC. Burwell v. Commissioner, supra, 89 T.C. at 592-594; Davis v. Commissioner, supra, 81 T.C. at 815 and n.9. *247 In the "One Universal Life Church" issue in our Burwell opinion, we looked at the substance of the transaction and not just the paper trail, holding that we "will not, by closing our eyes to reality, allow a paper trail to transform illusion into a tax deduction." 89 T.C. at 594. Here there is not even a paper trail to ULC Modesto. Petitioner deposited some of his earnings into his local ULC bank account over which he alone exercised dominion and control. Petitioner deposited the rest of his earnings into his Economic Concepts, Ltd. bank account over which he alone exercised dominion and control. The record does not show that ULC Modesto knew anything about any of this income or received any of this income. ULC Modesto did not even know of the existence of the purported partnership until 1985. ULC Modesto at no time entered into a partnership with petitioner. We cannot find that petitioner's local ULC church was a separate legal entity, let alone a tax-exempt entity. Petitioner's local church fails every test for tax-exempt status. Sec. 170(c)(2); sec. 501(c)(3). There is no evidence that his local church was organized for an exempt purpose; there is no *248 evidence that his local church was operated for an exempt purpose; there is ample evidence of proscribed inurement. Dew v. Commissioner, supra, 91 T.C. at 623-625. Petitioner simply tried to divert his own earned income to his local ULC church and to his purported partnership with his local ULC church. However, his local church and his partnership were nothing more than his own bank accounts, his own deep pockets. Accordingly, petitioner is taxable on his unreported net income deposited in his ULC bank account, in his personal account, and in his Economic Concepts, Ltd. bank account. II. FRAUD ADDITIONS The next issue is whether or not petitioner is liable for the additions to tax under section 6653(b) for fraud. Respondent has the burden to prove by clear and convincing evidence that (1) an underpayment of tax exists for each year, and (2) that a part of the underpayment of tax each year is due to fraud with the intent to evade tax. Sec. 7454(a); Rule 142(b); Wedvik v. Commissioner, 87 T.C. 1458, 1468-1469 (1986). The fraud envisioned by *249 section 6653(b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States, 635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affirming a Memorandum Opinion of this Court. Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud is a question of fact to be determined on the basis of the entire record. Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 389 U.S. 912 (1967). Fraud can seldom be proved by direct proof of the taxpayer's intention, and therefore fraud must be determined from the taxpayer's entire course of conduct and can be proved by circumstantial evidence. Spies v. United States, 317 U.S. 492 (1943); *250 Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Here the existence of an underpayment of tax each year has been clearly and convincingly established. Petitioner failed to report virtually all of his taxable income in 1982 and in 1983. A consistent pattern of underreporting substantial amounts of income over a period of time, standing alone, is strong evidence of an intent to evade taxes. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Cefalu v. Commissioner, 276 F.2d 122, 129 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Brooks v. Commissioner, 82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). This case, unlike most fraud cases, contains evidence from petitioner's own mouth, as related to the undercover special agent, as to petitioner's intent to evade taxes. The Court found Special Agent Hersey to be wholly credible, *251 and petitioner does not really challenge most of Hersey's testimony. It is true that petitioner's conversation with Hersey related primarily as to how he (Hersey) or petitioner's other clients could use the ULC local church scam to avoid their taxes, the usual phony ULC deduction scheme. Merely counseling and assisting other taxpayers to file fraudulent returns would not necessarily prove that petitioner's own tax returns were fraudulent. However, petitioner's conversations with Hersey amply demonstrate that petitioner was well aware that his clients' "donations" or "contributions" which he deposited in his own ULC bank account and used for his own personal living expenses were simply the fees paid for petitioner's services of financial counseling, tax return preparation, and setting up the clients' own local churches. Petitioner knew these "contributions" and "donations" were not going to ULC Modesto or to any other tax-exempt church; he knew this money was going into his own pocket in effect. Petitioner admitted to Hersey that he made at least $ 15,000 to $ 16,000 a year, but reported little or no income because of his ULC church scheme and his purported partnership with his ULC *252 church. This was a deliberate scheme to evade taxes. Petitioner prepared some 200 tax returns a year, and he knew he was being paid for such services. When petitioner directed his clients to make out the checks to the Universal Life Church and label them as "donations" or "contributions," he knew this was simply a device to evade payment of taxes on his income. When petitioner treated 75 percent of the income in the Economic Concepts, Ltd. bank account as income of ULC Modesto, he knew that was really his income. ULC Modesto did not learn of the existence of the purported partnership until 1985, and ULC Modesto at no time entered into any partnership with petitioner. Petitioner's Schedule A itemized deductions in 1983 exceeded his reported gross income. Petitioner's actions were nothing more than a cynical, calculated ploy to evade his taxes. Based upon the record in this case, we conclude that respondent has sustained his burden of proof and has established fraud each year by clear and convincing evidence. Thus, petitioner is liable for the addition to tax under section 6653(b)(1) each year. We further conclude that the entire underpayment of tax each year was attributable *253 to fraud. Thus, petitioner is liable for the further addition under section 6653(b)(2) computed on the entire underpayment each year. III. OTHER ADDITIONS Having found fraud, we do not reach respondent's alternative arguments under section 6651(a)(1), section 6653(a)(1), and section 6653(a)(2). However, there are other additions to be considered in this case. Section 6621(c) (formerly Section 6621(d))
Respondent asserted the additional interest under section 6621(c) (formerly section 6621(d)) in his answer, and therefore bears the burden of proof on this issue. Rule 142(a). Section 6621(c)(2) provides for an increase in the interest rate where there is a "substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions." Section 6621(c)(3) defines certain transactions as tax-motivated transactions. The increased interest is effective as to interest accruing after December 31, 1984 (the date of enactment of the original section 6621(d)), even though the tax-motivated transaction was entered into prior *254 to that date and "regardless of the date the return was filed." H. Rept. 98-861 (Conf.), 1984-3 C.B. (Vol. 2) 1, 239; Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Such increased interest under section 6621(c)(or 6621(d)) has been upheld in cases involving "blatant misuse of the charitable donation provisions." Snyder v. Commissioner, 86 T.C. 567, 588-589 (1986); Parker v. Commissioner, 86 T.C. 547, 566-567 (1986); Johnson v. Commissioner, 85 T.C. 469, 483-484 (1985). The particular category of tax-motivated transaction in those cases was a valuation overstatement (section 6621(c)(3)(A)(i)), which gave rise to the improper charitable contributions deduction. The increased interest under section 6621(c) has also been applied to phony charitable contributions deductions generated by a taxpayer's use of his local ULC church. Mulvaney v. Commissioner, T.C. Memo. 1988-243. There the category of tax-motivated transaction was a sham or fraudulent transaction under section 6621(c)(3)(A)(v).[15]
*255 We have concluded above that petitioner's omission of almost all of his income through use of his local ULC church and his purported partnership with ULC Modesto or his local ULC church was fraudulent. Petitioner's actions constitute a sham or fraudulent transaction. As we pointed out in Johnson v. Commissioner, supra, 85 T.C. at 484, this case is a clear "example of the kind of abuse at which section 6621(d)[section 6621(c)] is directly aimed." Accordingly, we conclude that the entire underpayment of tax each year was attributable to a tax-motivated transaction and that the increased interest under section 6621(c) applies to interest accruing after December 31, 1984. Section 6661
Respondent determined in the notice of deficiency that petitioner is liable for an addition to tax under section 6661 for 1983. In his answer, respondent asserted that the addition should be computed at the rate of 25 percent of the amount of the underpayment of tax attributable to the substantial understatement, rather than the 10 percent stated in the deficiency notice. Under *256 section 6661 an understatement is "substantial" when it exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. Here petitioner's 1983 return reported only $ 47.26 in tax whereas he should have reported over $ 20,000, so clearly that is a substantial understatement of tax liability. Respondent has determined that there was adequate disclosure as to certain items so as to reduce the amount of the understatement. Neither party has raised any issue as to these disclosed items, so we accept the $ 15,309 as the approximate amount of the substantial understatement for purposes of section 6661. [16]
The only question on the section 6661 issue is whether the rate is 10 percent or 25 percent. Respondent timely raised this issue in his answer, and no reason has been advanced, and we can think of no reason, why the higher rate as provided by the statute should not apply. Any issue as to which rate applies to such additions assessed after October 1, 1986, has been put to rest by Pallottini v. Commissioner, 90 T.C. 498 (1988). *257 Accordingly, we sustain the section 6661 addition at the 25 percent rate. Section 6673
In his answer, respondent also asked for an award of damages to the United States under section 6673. Section 6673 grants this Court authority to award damages to the United States, in an amount up to $ 5,000, whenever it appears to the Court that the proceedings have been instituted or maintained primarily for delay, that the taxpayer's position in such proceedings was frivolous or groundless, or that the taxpayer unreasonably failed to pursue available administrative remedies. [17]
Damages have been awarded to the United States in many ULC cases where the taxpayer has claimed phony charitable contributions deductions to his local ULC church. See Dew v. Commissioner, supra, 91 T.C. at 625-626 *258 and cases collated in n.9 at 626; Burwell v. Commissioner, supra, 89 T.C. at 597-598. Many of those ULC cases awarding damages were decided prior to 1986, the year petitioner filed his petition in this case. During the trial petitioner admitted he was familiar with some of the earlier ULC cases. However, since petitioner's criminal tax case was still pending at the time of the trial and since it was respondent, not petitioner, who unsuccessfully sought a continuance of the trial of this case, we cannot say that the proceedings in this case were instituted or maintained primarily for delay. The next question is whether damages should be awarded to the United States because petitioner's position in the proceedings was frivolous or groundless. Here we reach a different conclusion. We have found that petitioner's whole ULC scheme was fraudulent and was carried out with intent to evade taxes. We are also satisfied that the usual ULC phony charitable contributions deduction scam must by this time be considered to be a frivolous or groundless position. Harrison v. Commissioner, 805 F.2d 973 (11th Cir. 1986), affg. an unpublished Bench Opinion *259 of this Court. Petitioner's scam, however, is a new twist on the usual ULC cases. Nevertheless, the novelty of petitioner's sham and fraudulent ULC transaction should not serve to disguise what it really is, a frivolous or groundless position. This is the type of abuse at which section 6673 is directly aimed, and mere ingenuity in coming up with a fresh approach to a tired and long-discredited gimmick should not be rewarded by the Court's refraining from awarding damages. Accordingly, we award damages to the United States in the amount of $ 3,000. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
*. Computed at the rate of 10 percent on a substantial understatement of $ 15,309, respondent having determined there was adequate disclosure as to the balance of the understatement of tax.↩
1. An investment tax credit and a depreciation deduction on an automobile are also involved in 1983 and will be discussed in connection with these business expense deductions. In addition, there are two automatic adjustments (general sales tax and medical expense) that will depend upon our final determination of the adjusted gross income for 1983.↩
2. Petitioner is entirely self-taught. He has only a high school education and no college training. He has no formal education in the area of tax law, and has no legal training. However, petitioner openly boasts that he has practiced law for 20 years without a license.↩
3. Petitioner challenges the use of the terms "local charter," "local church," or "local chapter," arguing as have many other taxpayers in ULC cases that there is only one Universal Life Church in the world. This shopworn argument will be addressed in the opinion below. Petitioner insists that the numbers are "File numbers" or "Congregation numbers." However, in some of his own contemporaneous correspondence with ULC Modesto, petitioner himself used the term "local churches" and so shall we.↩
4. While petitioner contends that account No. XXXXX6680While petitioner contends that account No. XXXXX6680 belongs to ULC Modesto, there is no evidence to support his contention. Petitioner is the sole person exercising any dominion or control over that bank account.↩
5. Respondent determined that there were unexplained deposits constituting unreported taxable income of $ 6,700 in that account, and that there were no transfers or duplications among accounts to reduce that figure. The Court finds a larger amount of unreported income. However, respondent has not sought an increased deficiency for 1982, and therefore the unreported taxable income figure will be deemed to be $ 6,700. ↩
6. Respondent, using rounded figures, determined that the deposits of $ 23,334 should be reduced for transfers in the amount of $ 2,700, for net deposits of $ 20,634 in petitioner's ULC bank account. The record does not explain that $ 2,700 figure. It appears that $ 2,375 was transferred from that account to the bank account of Economic Concepts, Ltd. However, since respondent determined a higher figure of $ 2,700 in transfers, which is in petitioner's favor, the Court will use that higher figure.↩
7. Petitioner denied that a person had to pay a fee to become a member or a minister of ULC Modesto, but some of the individuals recruited by petitioner testified to that fact and the Court believes their testimony. Some of these individuals did not ask and apparently did not care where their checks went, but the record clearly establishes, for example, that David A. Perkins' check in the amount of $ 1,500 was deposited into petitioner's local church bank account No. XXXXX6680. Modesto, but some of the individuals recruited by petitioner testified to that fact and the Court believes their testimony. Some of these individuals did not ask and apparently did not care where their checks went, but the record clearly establishes, for example, that David A. Perkins' check in the amount of $ 1,500 was deposited into petitioner's local church bank account No. XXXXX6680.↩
8. Petitioner contends that the partnership articles were filed with the State of Florida, but no evidence of that fact was produced at the trial. Whether or not such a document was filed with the state would not affect the outcome of this case.↩
9. Of the $ 43,964.74 total deposits, there clearly should be a reduction of $ 6,950. Petitioner wrote checks on that account in the total amount of $ 6,950 and deposited them in his ULC bank account; hence these amounts must be deducted to avoid duplication for transfers among the various banks accounts. The record does not explain the additional reduction of $ 2,759.74 that respondent allowed to come up with net deposits of $ 34,255. However, since this larger reduction favors petitioner, the Court will use the $ 34,255 figure as the net deposits figure for the Economic Concepts, Ltd. bank account. Respondent used this net deposits figure of $ 34,255 as the gross receipts for the income-producing activities carried on under the name of Economic Concepts, Ltd.↩
10. Line 16 of Schedule B reads "At any time during the tax year, did you have an interest in or a signature or other authority over a bank account, securities account, or other financial account in a foreign country?" Petitioner did not answer that question. Petitioner had been preparing tax returns for his customers and clients for some 14 to 15 years, and the Court simply does not believe petitioner's testimony that he just overlooked this question on Schedule B.↩
11. There were total deposits of $ 4,028.25 in that account in 1983. Using rounded figures, respondent reduced $ 4,028 by transfers in the amount of $ 1,647, for net unexplained deposits of $ 2,381, which respondent determined to be unreported taxable income for 1983. The record does not explain the $ 1,647 figure, but since respondent determined those were proper reductions and since that is in petitioner's favor, we accept the figure and find that the unreported taxable income is the net figure of $ 2,381.↩
12. The unreported income taxable to petitioner in 1982 is the net deposits to his ULC bank account that year, $ 6,700. See n.5, supra. The total unreported income taxable to petitioner in 1983 amounts to $ 48,551, which includes two amounts ($ 20,227 and $ 28,324) computed as follows: (1)
$ 20,634.00
net deposits to ULC bank account (nn.6,7, supra)
+   2,381.00
net deposits to personal bank account
(n.11, supra)
$ 23,015.00
-   2,788.00
gross receipts reported on 1983 return
$ 20,227.00
(2)
$ 34,255.00
net deposits to Economic Concepts, Ltd. bank
account (n.9, supra)
-   4,808.39
business expense deductions determined
by respondent
$ 29,446.61
-   1,122.82
income from Economic Concepts, Ltd.
reported on petitioner's 1983 return
$ 28,323.79
(rounded off to $ 28,324)
The record does not disclose the nature or amounts of the various business expenses allowed by respondent. There is no evidence in the record to establish that petitioner is entitled to any greater amount either as to his Schedule C or Economic Concepts, Ltd., except in regard to an automobile. Respondent disallowed both the depreciation deduction and the investment tax credit on an automobile petitioner purchased in 1983 and used solely in his various business activities. In the Rule 155 computations, the depreciation and the investment credit should be allowed, computed, however, on the correct cost basis as set out in our Findings of Fact.↩
13. Petitioner gave similar advice to other individuals who testified at the trial, including William G. Nadzak, Ralph Swanson, and David Perkins. Besides helping these persons set up local ULC churches, petitioner also assisted Ralph Swanson in establishing Postulate Partners, Ltd., a limited partnership arrangement similar to petitioner's Economic Concepts, Ltd.↩
14. ULC Modesto's exemption was revoked by the Internal Revenue Service in 1984. ULC Modesto challenged that action in court, but the revocation was upheld. Universal Life Church, Inc. v. United States, 13 Cl.Ct. 567 (1987), affd. without published opinion 862 F.2d 321↩ (Fed. Cir. 1988).
15. Section 1535 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2750, amended section 6621(d) to renumber it as section 6621(c), to clarify that sham or fraudulent transactions were included among the "tax motivated transactions" covered by section 6621(c). That amendment applies to any underpayment with respect to which there was not a final court decision before the date of its enactment (October 22, 1986) and applies to interest accruing after December 31, 1984. H. Rept. 99-841 (Conf.), 1986-3 C.B. (Vol. 4) 795-796; Price v. Commissioner, 88 T.C. 860, 888↩ (1987).
16. In the Rule 155 computations, there will be some slight adjustment once the depreciation and investment credit on the automobile are allowed.↩
17. Under the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106 (Dec. 19, 1989), as to positions taken after December 31, 1989, in proceedings that are pending on, or commenced after, such date, this Court may award damages (now called penalties) up to $ 25,000. See Martinez v. Commissioner, T.C. Memo. 1990-112; Gross v. Commissioner, T.C. Memo. 1990-93↩.